### IN THE

# COURT OF APPEALS

### OF

## MARYLAND.

---

### *December Term,* 1832.

## LEE and WIFE, and JORDAN, *vs.* STONE and McWILLIAMS.
### *December,* 1832.

Courts of Chancery in adjusting the conflicting rights of creditors, following by analogy the principles of the common law, will, as far as equity and good conscience permit, regard a judgment as a lien upon the equitable real estate of the debtor.

In Chancery, acts done *bona fide,* for the doing of which an order would on application have been passed as a matter of course, shall be regarded in the same light, as if emanating from an order previously obtained for that purpose.

A vendor of land, in equity, seeking to enforce his lien for a balance of purchase money by a re-sale, cannot require the court to tack to his lien, another debt, to the exclusion of a judgment creditor who has a constructive lien upon the same land.

A mortgagor who goes into Chancery to redeem, will not be permitted to do so, but upon payment not only of the mortgaged debt, but of all other debts due from him to the mortgagee.

But if a mortgagee seeks a foreclosure in Chancery, the mortgagor will be permitted to redeem upon payment of the mortgage debt, only; and if a subsequent mortgagee, or judgment creditor, files a bill to redeem, he will be permitted to do so, upon the payment of the mortgage debt, alone.

The real estate of I, a deceased insolvent, was sold under a decree for the payment of debts, to B. This sale was regularly confirmed. B not having paid the *entire* purchase money, the land was re-sold, and certain judgment creditors of his, who alleged his death, and that his personal estate was insufficient to pay his debts, claimed the payment of their demand out of the balance in the trustee's hands after satisfaction of the original purchase money. This application was opposed by the heirs at law of

Lee and Wife and Jordan *vs*. Stone and McWilliams.—1832.

I, who were minors at the time of the first sale, but whose guardian, (for whom B was security,) had received and wasted a large amount of the first purchase money, and who claimed the balance arising from the second sale in preference to the judgment creditors of B. The Chancellor confirmed the Auditor's accounts, awarding a payment to the judgment creditors, and his decree upon appeal was affirmed.

APPEAL from the Court of Chancery.

On the 30th of June, 1810, a decree was obtained in this court, for the sale of the real estate of one *Richard Jordan,* deceased, situate in *Saint Mary's* county, for the payment of his debts, upon a bill filed for that purpose, by a certain *Samuel Coombs ;* and *James Cook,* since deceased, was appointed a trustee to make the sale. The trustee reported, that he sold said estate to *Jeremiah Booth,* on the 24th of the then following September, which report was duly ratified and confirmed.

After various subsequent proceedings had in the premises, a petition was filed by the appellees, *Joseph Stone* and *Alexander McWilliams,* on the 19th of March, 1828, in which it was alleged, that the petitioners, at August term of *Saint Mary's* County Court in the year 1822, recovered a judgment against *Booth,* the purchaser, since deceased, and one *James Walker,* (now insolvent) for a large sum of money, which judgment was affirmed by the Court of Appeals at June term, 1825. That *Booth* not having paid the whole purchase money in his life time, the property so by him purchased, was re-sold by an order of this court for the purpose of paying the balance due to the estate of *Jordan.* That *Booth* died without leaving personal property adequate to the payment of his debts, and the petitioners insist, that in virtue of their judgment they have an equitable lien on his interest in the aforesaid land, and upon the balance of the purchase money arising therefrom; and they pray that it may be so applied.

Afterwards, on the 20th of March, 1828. the appellants, *Richard H. Lee* and *Ann* his wife, (formerly *Ann Jordan,*) and *Richard Jordan,* the said *Ann* and *Richard* being the

children and heirs of *Richard Jordan* deceased, filed their petition, in which, after stating in substance the facts contained in the previous petition, they say, that the re-sale spoken of above, was made upon an agreement between them and the heirs of *Booth*, the purchaser, dated June 21st, 1826, by the terms of which, said sale was made for the payment of the balance ascertained by the auditor's report, to have been due the estate of *Richard Jordan*, of $2018.93, with interest from the 19th of February, 1825; as also for the payment of such other sum as should appear to be due from the estate of the said *Booth*, to the heirs of *Jordan;* provided, that in relation to such latter sum, there should be no other claims against *Booth's* estate entitled to a preference. That at the period of the first sale, under the original decree, the petitioners, *Ann* and *Richard*, were minors, and that one *Edmund Key* was their *guardian*, and that *Booth* was one of the securities in his bond as such. That whilst acting in that character, their said guardian received at sundry times on account of said petitioners, from the trustee who made the sale, and from *Booth* the purchaser, and under the order of this court, out of the proceeds of and on account of said sale, the sum of $3972.07, of which sum your petitioners have received together only the sum of $555.25; and consequently, the whole difference with the interest is now due them, and they contend that the same constitutes a lien upon the proceeds of sale, made by the trustee who re-sold the property, or that at all events, they are in respect of such sum, entitled to participate equally with all other creditors. That *Key*, the former *guardian* is utterly insolvent, and has been discharged as such.

The agreement of the 21st of June, 1826, referred to in the above petition, states, that, "It is agreed, that the account and report filed by the auditor on the 19th of June, 1826, be ratified and confirmed, and that the land mentioned in the proceedings be sold by the decree of this court, for the payment of the balance due by the estate of *Jeremiah Booth* to the estate of *Richard Jordan*, to wit: the sum of

$2018.93 with interest from the 19th of February, 1825, and costs; and it was further agreed that there should be no appeal on either side, and that if it should be made to appear to the satisfaction of the Chancellor, that there are other moneys due to the heirs of *Richard Jordan* from the estate of the said *Booth,* that then and in that case, the proceeds of the sale shall be applied to the payment thereof, as well as of the before mentioned sum of $2018.93, provided there are no other claims against the estate of the said *Jeremiah Booth* entitled to a preference."

The account stated by the Auditor, which in pursuance of this agreement was ratified by the Chancellor, is an account between *Booth,* the deceased purchaser, and the estate of *Jordan;* and in which, after charging him with the purchase money for the land, and crediting him with various payments to *Edmund Key* and others, made on account thereof, there appeared a balance against him due the heirs of *Jordan* of $2018.93, with interest from 19th of February, 1825.

For this sum the Chancellor on the 21st of March, 1827, decreed the land to be sold, unless the same should be paid to the heirs of *Jordan,* and the same was accordingly sold by a trustee appointed for that purpose, as stated in the preceding petition, for the sum of $6958.75.

The auditor subsequently stated an account, which, after appropriating so much of the proceeds of this last sale as was sufficient to pay the appellants, the heirs of *Jordan,* the amount reported to be due them by the report of the 19th of June, 1826, applied the balance as far as it would go towards the payment of the judgment of the appellees, and other judgment creditors, there being evidence of the insolvency of *Walker,* the other judgment debtor; the whole amount of the judgment in favor of the appellees, was charged against the estate of *Booth.*

There was evidence also of the insolvency of *Key,* the guardian,—that *Booth* was one of the securities in his guardian's bond.

Exceptions were filed to this report, but the Chancellor,

(*Bland*,) on the 7th of February, 1831, overruled the exceptions, ratified the report, and directed the trustee to apply the proceeds accordingly.

From this decree the case was brought by appeal to this court.

The cause was argued before MARTIN, STEPHEN and DORSEY, J.

*Johnson*, for the appellant.

Situated as this fund is, the judgment creditors are not entitled to the exclusion of other creditors. The equity of the present appellants to be paid the whole of their claim, or at least to participate with the judgment creditors, cannot be successfully disputed. The money which they seek to have refunded them, was improperly paid to, and misapplied by *Key*, the guardian, for whom *Booth* was a surety. If *Booth* had lived, there can be no doubt that he would have been responsible for the money wasted by *Key;* and it is not perceived how his death can prevent those to whom his principal is indebted, from coming in for at least a *pro rata* share of his estate.

*Scott*, for the appellees.

There is but one question in this cause, and that is, have the appellants, or the appellees, or either of them, a lien upon the fund subject to distribution?

The appellants claim a lien upon the ground that their claim is for the balance of the purchase money, or against *Booth* as the security of *Key*, who was their guardian, and is insolvent.

Their claim consists of the following items:

1st. $219    given up by the trustee, *Cook*, out of his commissions.

2.   $1000   paid *Key* by *Booth* on 15th Mar., 1813.

3.   $115   paid *Key* by *Booth*   15th Aug. 1814.

4.   $11   paid *Key* by *Booth*   14th Jan. 1817.

5.   $430 66   paid *Key* by *Cook*, the trustee, 13th January, 1819.

The first item cannot be pretended to have been a part of the purchase money: it was a donation by *Cook* to *Anna Jordan*, now *Lee*, and *Richard Jordan*, of a part of his commission.

The fourth item was a payment by *Cook* himself to *Key*.

As to the 2d. 3d and 4th items, although there is no positive proof, that those payments were made by the direction of *Cook*, yet the conclusion is strong, almost irresistible, that they were made with his concurrence. We find that *Booth* made other payments which are not contested, and the debts being, as was then supposed, all paid, *Key*, as the guardian, was entitled to receive the balance. The proceedings in this cause go to show also, that it was the understanding of the parties that those payments were properly applied to the credit of *Booth* for the balance of the purchase money. *Anna Jordan* was of age as far back as 1819. This is ascertained by payments made to her by *Cook* himself on 13th February, 1819. *Booth* died in 1824, and *Anna Jordan* first filed her petition for a re-sale on the 5th July, 1825, and *Anna Jordan* and *Richard Jordan* filed their second petitition on 3d January, 1826. To that petition *Llewellin* and wife, the heir of *Booth*, filed their answer and exhibits in February, 1826, showing the payments before mentioned by *Booth* to *Key*, and they charge that those payments were made by the consent of the trustee.

The case was referred to the auditor, and on the 19th of June, 1826, he reported a balance due by *Booth* to the heirs of *Jordan*, of $2018.93, and no more, giving to the representatives of *Booth* credits for the said payments to *Key*. On 21st of June, 1826, an agreement was filed assenting to this statement, and on 21st of March, 1827, this account was ratified by the Chancellor. Here then was an ascertainment by *consent* of parties of the balance due by the heirs of *Booth* to the heirs of *Jordan*, and no exception was taken within nine months to the ratification of this report, and it is now too late. The heirs of *Jordan* are estopped, as well by their own concurrence, as by the lapse

of time, from saying that the credit and statement of 19th June, 1826, does not show the true balance due to them from *Booth,* as the purchaser of the real estate of their father.

Besides, the agreement of 21st June, 1826, shows an unequivocal abandonment on the part of the appellants to all claim of lien on the land, and if under that agreement the heirs of *Booth* had paid the balance therein mentioned, viz: $2018.93, they would have been immediately entitled to a fee simple interest in the land, subject nevertheless to the claims of *Booth's* creditors, according to their respective rights. All the rights of *Booth's* heirs being subject to his creditors, those creditors have the same rights which his heirs would have had if there had been no creditors. The balance of $2018.93 has been paid, and the lien is gone.

Suppose *Booth* had sold his equitable estate in those lands, and his assignee, instead of his heir, had paid the balance so ascertained as aforesaid, would he not have been entitled to a fee simple in the land, or could the heirs of *Jordan,* after such acquiescence, have claimed a lien upon those lands for the money so paid to *Key?* If they could not, are they in any better situation when this fund is claimed by a judgment creditor?

It is said, however, that the appellees rely upon "*res inter alios acta.*" The counsel for the appellees dissent from the application of this maxim to the case now under consideration, and only contend that the appellants shall be bound by their own act. In this view of the case, the appellants have no lien as for a balance of the purchase money, and they must resort to their claim against *Booth* as the security of *Key,* and must show a lien upon that ground. *Key* was the guardian of *Anna Jordan* and *Richard Jordan,* and as such, he was entitled to receive the balance of the purchase money which remained after the payment of *Jordan's* debts, and on application, the Chancellor would have passed an order directing such payment, and

upon the payment of such balance the purchaser would have been entitled to a decree. From all that appears, no such order ever was passed : but it is a well established rule in equity, that if a party does that without an order which he would be required to do, that he is entitled to the same benefit as if it had been done under an order. In this view of the case then, if *Booth* had not been the security of *Key*, the parties would have had no lien. Does the fact then of his being the security make any difference ? It appears to me that it does not : it is contrary to the policy of the law to extend the doctrine of lien, and this application of it would be pushing the doctrine beyond any thing decided in the cases to which the court has been referred, would warrant.

Indeed, so far from establishing a lien, it may well be doubted whether the appellants have shown themselves entitled to be considered as creditors of *Booth* for the defalcations of *Key*. Their claim is founded upon a bond with a collateral condition ; neither the bond, nor a copy of it, is produced. There must have been other co-obligors. It is not shown whether they are living, nor what are their circumstances,. or whether any proceedings have been had against them. To entitle the parties to proceed against the estate of the deceased obligor, they should first have shown that they had used due diligence against the surviving obligors, and without success, and this they have failed to do. *Anna Jordan* was of age in 1819, and it is not until 1825, that any efforts are made to recover *this* money. Indeed I might say until 1829. It is to be presumed that *Richard Jordan* also became of age either before, or shortly after his sister, for we find him too receiving money, and during all this time nothing is said about *Booth's* liability as the security for *Key*. *Key* has not been called upon to settle his account in the Orphans Court, this too should have been done, for although he was insolvent in 1829, it does not appear that he was insolvent when the appellants, his wards, became of age. There is then nothing in this

case to make it an object of peculiar care to a Court of Equity. It is merely a legal demand against a security, and such claims are not entitled to favor either in a court of law or equity. In this view of the case then, the appellants have no lien upon the fund, either for a balance of the purchase money, or against *Booth* as the security of *Key*, and it remains to be considered, whether the appellees have shown themselves creditors of *Booth*, and entitled to a lien.

Their claim is founded upon a judgment rendered in *St. Mary's* County Court, at *August* term, 1822, and it is not denied that they are creditors. Their claim is more than the amount of the whole fund, and it is contended that they have a lien upon it, and the appellants rely upon the acts of 1785, *ch.* 80, *sec.* 7, and 1798, *ch.* 101, *sub-ch.* 8, *sec.* 17. This fund is either realty or personalty, take it either way; the appellants are entitled to be paid before all other creditors, except those having a lien upon the fund, or elder judgments. There are none such.

The only question then is upon the mistake in the statement of the auditor. This is conceded ; but if the appellants are entitled to a preference, it is of no consequence, as their claim is larger than the whole balance.

It follows of course, in this view of the subject, that the order of the Chancellor, giving the balance of the purchase money, in the hands of the trustee, to the appellees, should be affirmed, and the appeal dismissed with costs.

*Mayer* in reply.

The question here is not whether the judgment of the appellees was a lien on *Booth's* interest in the land, because, whether a lien or not, the judgment could only bind that interest *subject to all the equities* which bound *Booth* in respect of it toward the appellants, and which involved that interest. That a judgment takes the subject of its lien, subject to all the equities of the debtor, will not, we presume, be denied. *Burgh vs. Francis*, 3 *Bac.*

*Abr.* 643.   1 *Eq. Ca. Abr.* 320. 321.   *Finch vs. Earl of Winchelsea*, 1 *P. Wms.* 279.   *Brace. vs. Duchess of Marlborough*, 2 *P. Wms.* 491.   *Finch's R.* 28.   *Taylor vs. Wheeler*, 2 *Vern.* 564.   *Pye vs. Danbuz*, 3 *Bro. C. C.* 595.   *Taylor vs. Wheeler*, 2. *Salk.* 449.   *Ex'r. of Polony & Read vs. Keenan and others*, 3 *Dessaus*, 74. *Read vs. Adm'r. of Simmons*, 2 *Dessaus*, 552.   If such be the law, then the question recurs, what were the equities of the appellants in regard to *Booth's* interest in the land and its ultimate proceeds?   The rule of Chancery is, that where equities are equal, the legal estate connected with one of them shall make it predominant.   The *legal estate* is to be regarded as in these appellants, the heirs of *Jordan*, although a trustee be appointed *to represent and transfer* their interest.   With this legal estate, have they not an equity *at least equal* to that of the appellants?   Will it not be deemed superior when it is considered that the purchaser, *Booth*, is identified as surety with the guardian, *Key*, who received without accounting for it, so large a sum of the money *as of the purchase money, and from Booth*, the purchaser himself;—*Booth* being, too, a contractor for the legal estate of the appellants, and in all cases where that estate is to pass from them, whether for *Booth's* benefit, or for those who claim under or against him, being virtually claimant of equity against the appellants, in his own person or that of his heirs, and whether made plaintiff or defendant?   On the other hand, a judgment creditor, to use *Lord Eldon's* words, *ex-parte Knott*, 11 *Ves. J.* 617, has neither *jus in re*, nor, *ad rem*, as to land on which he may have even a lien—and gets no estate in the land.   *Brace vs. Duchess of Marlboro'*, 2 *P. Wms.* 491.   *Anonymous*, 2 *Ves.* 662. *Pre. Ch.* 310.

It might, if necessary, be successfully contended, that the judgment was no lien here at all on the interest of *Booth*, such as it was, in the land.   That was a merely equitable interest, and *at the very time* of the rendition of the judgment, *liable to be sold* to pay the balance of pur-

chase money, *Booth* being then already in default, and his interest thus being at that period, to say the most for it, in the condition of a forfeited mortgage of an equitable estate. Such an interest, and in such a plight *Chancellor Kent* designates in *Bogart vs. Perry,* 1 *John. C. R.* 56, a mere *chose in action,* and holds not to be the object of lien, although in *New York* it has been decided that equitable estates in possession may be sold under execution. Our act of Assembly only declares that equitable interests in land may be sold under execution. The *Stat.* 29 *Car.* 2 *c.* 3. *s.* 10, says as much in subjecting to execution the lands of debtors held in trust for them; and yet under that statute, judgments are held to be no liens on the interests it mentions. 2 *Pow. Mort.* 606, 607, 608. *United States vs. Morrison,* 4 *Pets. Sup. C. R.* 137, which considers a judgment lien on realty as incidental only to a right to an *Elegit,* which does not attach to an equitable estate.

Leaving, however, the point of lien,—because the appellees' reliance on that, is a *petitio principii,* and its discussion therefore unimportant,—we return to the relative predicaments, legal and equitable, of the parties. And here, so far as *legal* liability and pretension is concerned, let it be borne in mind that in the case of the appellees, the debt on the joint judgment against *Booth* and *Walker,* by *Booth's* death, survived *at law* against Walker, and that they can come here (after proof of insolvency) upon *equitable* merits alone, and armed with no *legal* preference or claim against the fund. Their judgment, *quâ* judgment, is unimportant, and figures only as another more solemn *form of evidence* for their demand. Looking to the question of equities, we find the appellants clothed with the legal estate, and with an equity at least equal to that of the appellees. Having this ascendancy, the appellants may *retain their hold of the legal estate* until all their claims shall be paid, especially where the supervening claim, as this against *Key,* is so *connected* with the principal claim, *and arose,* as the accounts will show, as to the

greater part of it, *nine years, and as to the rest, five and three years, before the judgment was rendered in the County Court for the appellees.* The advance to *Key* for which he is in default was $1,000 on 15th of March, 1813—$115 on the 15th August, 1814—$11 on 14th January, 1817—$430.66 on 13th February, 1819—*the judgment* was rendered at August term, 1822, of *Saint Mary's* County Court, and affirmed by the Court of Appeals at June term, 1825. The preference which the legal estate assures to a claimant for his original demand, secured expressly by the estate, and also for claims for further sums furnished, especially where they are *antecedent*, as here, to the opposing incumbrance, is well established. Payments and disbursements by the holder for the time of a legal estate will be thus covered and secured by the estate, although the conveyance of the estate to the party be set aside as inequitable. *James vs. Johnson, 6 John. C. R.* 429. *Brinkerhoff vs. Marvin, 5 John. C. R.* 320, 326. *Hendricks vs. Robinson, 2 John. C. R.* 309. *Jarvis' Adm'r. vs. Rogers, 15 Mass. R.* 389. *Harding vs. Wheating, 2 Mason's R.* 378. And the principle of this superinduced security is independent of any fact of advance being made, or debt contracted expressly or impliedly on the faith of the legal estate. The right of thus *retaining the legal estate* for payment of subsequent claims, has been carried so far as to make them over-reach even *mesne* incumbrances by mortgage, and although the additional moneys were not pretended to be advanced on the security of the legal estate. *Hedworth vs. Primate, Hardr.* 318. *Smithson vs. Thomson, 1 Atk.* 520. And such indeed is the operation in the familiar case of a *puisne* mortgagee buying in an *elder* mortgage, and, having so secured to himself the *legal estate*, gaining a preferred payment of not only his elder mortgage, but also of his younger mortgage *over intervening senior* mortages. *D'Arcy vs. Hall, 1 Vern.* 49. 1 *Ch. Ca.* 119. 2 *Ch. Ca.* 20. It is not pretended that a bond or simple contract creditor, purchasing, after his debt is contracted an elder mortgage prior in date

to the debt, can hold out intervening mortgages between his debt and the elder mortgage, until his debt shall be satisfied, just as little as a *subsequent judgment creditor*, as here, can effect that, as is decided in *Pre. Ch.* 313. *2 Ch. Rep.* 16. *Rob. Frad. Com.* 355. 1 *Eq. Ca. Ab'r.* 323. But where the legal estate is originally held, and *then* advances are made by, or debts contracted with the holder of the security in the legal estate, such liabilities, if *antecedent,* especially, to the judgment or other incumbrance in question, will be paid as if included in the original security, and are within the purview of the legal estate, their vantage ground. The appellees here are in the condition of creditors by subsequent judgment, who having neither *jus in re* nor *ad rem* (and who, it has been decided, are so far from having an *interest in* the land, or *a legal estate in it,* that they may release their right to the land and yet extend it afterwards) cannot gain any advantage for their judgment debts even by purchasing the elder mortgage; or in other words, the legal estate, which in this case we hold; as the adjudications cited by us will show. It is otherwise, where the judgment is older than the mortgage, and the judgment creditor purchases the mortgage. There he will hold out an *intervening* judgment creditor until satisfaction both of judgment and mortgage, notwithstanding the prior date of that intervening judgment to the mortgage. And this can only be because the mortgage gives the legal estate, the judgment giving no interest in the land. Just so is the case of these appellants, who on a long antecedent claim had the power of selling the property as effectually as it existed under the supposed judgment, and who also have the *legal estate* vested in them; who had right to a decree for sale for a default occurring even long before the judgment in question in this case was rendered, and whose additional claim existed before rendition of the judgment. *Smithson vs. Thomson,* 1 *Atk.* 520. It will not be denied that the appellants with their claim for the purchase money, stand virtually as mortgagees of the land.

We come then to the conclusion, that our claim for the money paid by *Booth*, the surety to *Key*, his principal, is secured to us in preference over the appellees, by the simple force of the principle, that where equities are equal, that which is attended by the legal estate shall be embraced by that estate and be predominant.   But is there not a superior equity in the appellants to that of the appellees? *Booth* was surety for *Key's* due application of the funds received by him as guardian.   He was thus identified with him in responsibility; and for any amount in which *Key* proved delinquent, *Booth* was *constructively* a co-operator with him in the breach of trust.

Suppose that *Booth*, instead of being surety for *Key*, the guardian, had been surety for *Cooke*, the trustee, on his trustee *bond*, and had paid money to *Cooke* on the purchase which *Cooke* had not accounted for?   Would such payment have been allowed to *Booth* as purchaser, upon an application by the appellants for re-sale of the property to pay any balance of the purchase money?   It would scarcely be pretended.   Such an allowance, for misapplied purchase moneys paid, would not be made to a purchaser in *England, although not a surety for the trustee. Lloyd vs. Baldwin*, 1 *Ves.* 173.   *Booth* stands in the relation of a purchaser, bound to see to the application of the purchase money so far as concerns the payments to *Key* the guardian, which he ventured to make to him.   The appellants were at that period the only persons for whom the trust in relation to the purchase money existed.   The case then is precisely like that of a trust for payment of a certain claim in which it is undisputed that the purchaser is bound to see to the application of the purchase money; and it is the more like such case, as the purchaser here has undertaken to make payment to the guardian of those who at the time were in fact entitled to the fund.   *Abbott vs. Gibbs*, 1 *Eq. Ab.* 358. *Sugden's Vend. & Pur.* 331. 332. 333. *Dunch vs. Kent*, 1 *Vern.* 260. *Spalding vs. Shalmer, et al., Ib.* 301.   So especially where the money belongs to an infant, payable to

him personally at his majority. *Dickinson vs. Dickinson*, 3 *Bro. C. C.* 19. And payments to an executor in account by a purchaser, are not allowed where the purchaser has notice of an outstanding debt of the testator. *Crane vs. Drake*, 2 *Vern.* 616, in which case there is no express contract, as here, identifying the parties in effect in duty and liability. So where there is a breach of trust known to the purchaser, committed in relation to the trust fund, the purchaser having paid the fund must still stand liable. *Watkins vs. Cheek*, 2 *Simon and Stew.* 199. What difference is there between a breach of trust known to a party or connived at by him, and one for which, known or unknown, the party is answerable, as a surety of a guardian is answerable for the guardian's misfeasances. The purchaser, too, is bound to see to the application of purchase money of land sold, under act of Parliament for a particular purpose. *Cotterel vs. Hampson, et al.* 2 *Vern.* 5. So connected in fact is the purchaser with the rights of those who are entitled to the benefit of the purchase money, that equity views him as a trustee for them in relation to the purchase money. *Sug. Vend.* 120. *ch.* 4. It seems clear then, that (independent of the consideration of the absence of all order of the court to authorise the payment) the purchaser, *Booth*, being at the same time a surety of *Key*, the guardian, was bound to see to the application of the purchase money he paid to *Key*, within the chancery rule as to purchasers in certain cases; and that though the payments might by the appellants be allowed in the account of the purchase money, *as between Booth and the trustee*, yet as between him and the heirs, they cannot avail effectively as payments; or, in other words, can avail only conditionally, that is, if duly applied by *Key*. To avoid circuity, therefore, and in view of the *comparative equities* of these contending parties, they may be considered as no payments. And we contend, at all events, that the equity of the appellants is as to these amounts enhanced by the duty of *Booth* to see to their application; and that in regard to them, therefore, the appel-

lants enjoy an equity superior to that which attaches to the claim of the appellees. This view steers clear of any opening, as it might possibly be deemed, of the agreement of 21st June, 1826, on which the decree for re-sale was passed—open as is that agreement in the controversy between *these* litigants. But that agreement, made between *other parties* and to regulate *another account,—the account between trustee and purchaser,*—is no bar to an examination of *the nature and character* of any of the credits there introduced, when that examination is made for estimating the equities, or otherwise adjudging the claims of *other* parties *since* brought into the cause. The very agreement too, provides for the payment of *all other claims* of the appellants, beside that for the balance of the account of *purchase money,* to be prevented only by claims commanding a preference over such other claims. The very agreement, then, in effect, *reserves the rights* of the appellants as to the items of payments to *Key,* which are introduced into the purchase money account referred to,—because there are no *further claims* of the appellants, than that arising *on those items.* It is *this question of that preference* in regard to those additional claims, that we now are investigating; and now if on this question that account which is the subject of the agreement be used by appellants or appellees, it must be used with due regard to all the circumstances attending the payments allowed; in other words, with due regard to the *legal and equitable character* of those different items of payment, and according to their intrinsic merits. *It is that very character and those merits* which we have been endeavoring to exhibit. It is, therefore, begging the question to contend, that the agreement bars our pretension to bring the present claim under the original security, by showing that the amount of it never was in legal effect paid by the purchaser as against us; especially as that claim is looked to as one of the objects of the sale decreed, and for the application of the proceeds. It might as well be said that an agreement is to be an estoppel without

its contents being ascertained by the court, as to contend, as virtually is done here, that the items of the account, which is the subject of the agreement, are not to have effect according to their legal and equitable operation in reference to the parties respectively and variously concerned. Now it is plain, that in the account as between purchaser and trustee, the legal and equitable operation of the payments to *Key* might be, or be admitted so to be, to introduce them as credits in that account, and yet as to ulterior parties and contending claimants of an amount *beyond the balance of the account*, which is the present state of things, these items might not avail as payments. It is so far *res inter alios acta.* We have therefore a right to canvass the items of the account, and show that certain items are not, as between these parties, to be allowed *Booth* as payments to reduce his debt for the purchase. But, at all events, to recur to the other aspect in which we reviewed the particulars of those items, we may make the examination to show the superiority of our equity over our opponents.

The explanation we have given of the agreement, would answer the objection drawn from the fact of the agreement, to our disputing those items as payments, in consequence of the sums not being ordered by the Chancellor to be paid to the guardian. In this point of the absence of an order, there appears to us much force; because even granting that the Chancellor would have ordered the payment if he had been applied to, yet under the general powers of the court, confirmed too by act of Assembly, he might also have ordered the investment of the money by the guardian for the benefit of the infants, instead of an unconditional payment over to him.

2. The utmost, it seems to us, that the appellees in any view could aspire to, would be to have payment *pari passu* with our demands, as in a case, where there being no acknowledged legal estate, (as there is here,) on which to engraft the claim, a fund, by virtue of the general authority of the court, in protection of creditors, comes under the

control of a Court of Chancery. *Codwise vs. Gelston*, 10 *John. R.* 507. *Riggs vs. Murray*, 2 *John. C. R.* 576. Our claim, however, and the origin of the fund now required to answer it, are such, that the principles referred to, of a *pari passu* payment, do not apply.

The idea urged by the appellees, does not appear tenable, that because an executor or administrator, under our testamentary act of 1798, *ch.* 101, is required to pay judgments as preferred debts out of the personal estate, therefore they must be so paid out of *any fund*, no matter what its origin, nor whether the case be or be not an administration of an estate, wherever there happens to be a *death* of a debtor; and although by that death, as here, the *legal liability* survives against the other joint debtor. The surviving of the liability would prevent the administrator or executor even from paying the judgment as a preferred debt in course of administration; and the creditors would have to resort even there to equity. However, the view of the act of 1798, *ch.* 101, it would seem, cannot be sustained on this occasion, unless it be sufficient for premises to contain one term that is found in other premises, to lead to that conclusion in which those other premises result.

3. With regard to the errors of amount, they are too obvious to require argument. The auditor, in his charges against the appellants of payments from *Key*, not taking the whole of the statements of their petition, singles out the admission there of a payment of $555.25, and inserts it in his account as a new payment over and above those already credited to *Key*. On examination it will be found to be the aggregate of amounts already credited.

4. The other error was in omitting the credit to the appellants for the payment by *Mr. Cooke*, the trustee, to *Mr. Key*, for the benefit of the appellants, of $219, given up from the trustee's commissions, and for which the guardian, *Key*, and therefore *Booth*, was responsible.

5. In conclusion, we would suggest, that this is, in regard to the appellants, the case of claims accrued to them while infants—of equities originating at a period of infancy. The very character of infants at that period, to which the comparison of equities must look back, would, according to all decisions, give superiority to the equity of the appellants, and entitle them to prevail even if uninvested with the legal estate which now fortifies them. *Drury vs. Conner,* 1 *Harr. & Gill,* 230.

DORSEY, J. delivered the opinion of the court.

Among the numerous grounds upon which the decree of the Chancellor is attempted to be reversed, the appellants have urged one, which, if sustainable, would remove all motive for further litigation on the various questions which have been discussed in the progress of the cause. It has been contended, that *Booth's* interest in the land sold, being a mere equitable estate, a judgment at law against him would create no lien upon it, that, in a Court of Equity, would give it a preference over the claims of his creditors generally. This position we cannot sanction. Courts of Chancery in adjusting the conflicting rights of creditors, following by analogy the principles of the common law, will, as far as equity and good conscience permit, regard a judgment as a lien upon the equitable real estate of the debtor. 1 *Pow. Mortg.* (*Coven. Ed.*) 263, 4, 276, 281, 2, 307, and 2 *Ib.* 607, 8.

The appellants have also insisted upon another principle, which if established would be equally conclusive on the matters in controversy; and that is, that the payments to *Edmund Key,* the guardian, having been made without the previous sanction of the Court of Chancery, were made by *Booth* in his own wrong, and ought not to be carried to his credit in ascertaining the balance of the purchase money due to the heirs of *Jordan.* To support a doctrine fraught with so much hardship and injustice, no unbending rule of law, or equity, has been adduced. We know of

none that could sustain it; and think the credits properly allowed, upon the established rule in chancery, that acts done *bona fide* without an order, for the doing of which, an order would on application have been passed as a matter of course, shall be regarded in the same light as if emanating from an order previously obtained for that purpose. But suppose it were otherwise, and that this objection if taken in due season were well founded. The appellants have precluded themselves from all benefit which they might otherwise have derived from it, by their agreement of the 21st of June, 1826, and by the Chancellor's order under that agreement, ratifying the auditor's statement, from which ratification no appeal was taken within the time prescribed by the act of Assembly.

By this order of the Chancellor, all the payments were confirmed as credits to be deducted from the balance of the purchase money then due by *Booth's* estate; and if there were errors in it, the time has elapsed within which their correction must have been sought. But there was no such error. Even if the ground first assumed to maintain the auditor's statement were untenable, the agreement of the parties is ample for that purpose. Upon no principle of fair construction, can the appellants' interpretation of it be supported. They seek to evade the conclusiveness of the Chancellor's order, from its not having been appealed from within the limited time, and to open to scrutiny and revision, the items in the auditor's statement, by that part of the agreement which states, that "it is further agreed, that if a sale should be made under this agreement, if it should be made appear to the satisfaction of the Chancellor, that there are other moneys due to the heirs of *Richard Jordan,* from the estate of the said *Jeremiah Booth,* that then, and in that case, the proceeds of the sale shall be applied to the payment thereof, as well as to the before mentioned sum of $2018.93, with interest and costs, provided there are no other claims against the estate of the said *Jeremiah Booth,* entitled to a preference or participation in the fund." But

this part of the agreement was never designed to license a nullification, or impeachment of the auditor's statement, or any part of its contents; but was intended simply to authorise the appellants to increase and secure the payment of the balance due them, by proving claims against the estate of *Booth,* not professed to be adjusted by the audit, manifestly looking to the claim now insisted on against *Booth,* as the security of *Key,* in his guardian's bond.

It has been further contended, that the appellants are to be first paid, as well the balance due them from *Key,* as that which appears on the auditor's account; *Booth,* as the security, being answerable for the defalcations of the guardian;—that the appellants being seized of the legal estate in the land sold, their legal title could not be taken from them until they were paid, not only the remaining balance of the purchase money upon whatever account due from *Booth* to them; and this pretension is rested upon the familiar principles of equity, "that he who seeks equity, must do equity; that a multiplication or circuity of action should be avoided."

But these principles have never been carried to the extent, that would be necessary to their affording relief to a party in the predicament of the present appellants. They stand here in the character of complainants seeking to enforce their lien, for a balance of the purchase money, by a sale of the premises on which their lien attaches; and require this court not only to enforce their lien, but to *tack* to it another debt, apart from such their application entitled to no priority over other creditors; and this to the exclusion of another creditor before the court, whose debt is secured by a lien on the premises. If there be any case to warrant this requisition, it has not been presented to our notice in the argument; and has certainly escaped our researches upon the subject. It is true, that if a mortgagor goes into chancery to redeem, upon the axioms of equity above mentioned, he will not be permitted to do so but upon payment, not only of the mortgage debt, but of all other

debts due from him to the mortgagee. In this there is no prejudice to the rights of others; no body has a right to complain: no injustice is done to any body.

But it is also true, that if the mortgagee seek a fore-closure in chancery, the mortgagor will be permitted to re-deem upon payment of the mortgage debt only, no matter to what amount, on other accounts, he may stand indebted to the mortgagee. And it is equally clear, that if a subse-quent mortgagee, or judgment creditor, file a bill to re-deem, he will be permitted to do so upon the payment of the mortgage debt alone. Whilst these well settled prin-ciples of equity remain unshaken, upon no system of anal-ogy or consistency can the claim of the appellants be grati-fied. Their doctrine is, in effect, simply this, that in all cases where the sale of the real estate of a deceased debtor is decreed, the debts due to the heirs at law, to whom such estate has descended, be their nature what they may, must first be paid, even to the exclusion of judgment creditors. To such a length the doctrine of tacking has never yet been carried.

The views we have expressed of the prominent features of this case, render it unnecessary to investigate the audi-tor's statements, to ascertain whether the alleged error of having twice credited the guardian with the same expendi-ture of $555.25, exist or not; as the result of such an in-vestigation could not affect the Chancellor's decree. If there be such error, it would only vary the general balance due to the appellants. It forms no part of the amount se-cured by their specific lien, and would be postponed until the judgment of the appellees were wholly paid, for which the entire fund in dispute is greatly inadequate.

**DECREE AFFIRMED WITH COSTS.**